**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **United States ex rel.,** | ) | **Case No.  5:01 CV 2007** |
| | ) | |
| **ORLANDO GUADALUPE,** | ) | |
| | ) | **Judge Dan Aaron Polster** |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| **THE GOODYEAR TIRE & RUBBER CO.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Before the Court is Defendant The Goodyear Tire & Rubber Company's Motion for

Summary Judgment (the "Motion") (**ECF No. 52**).  For the following reasons, the Motion is

**GRANTED**.

## I.    PROCEDURAL BACKGROUND

On August 20, 2001, Relator Orlando Guadalupe, a former employee of Defendant

The Goodyear Tire & Rubber Co. ("Goodyear"), sued Goodyear on behalf of the federal government

alleging that Goodyear violated the False Claims Act ("FCA"), 31 U.S.C.

§ 3729, *et seq.*, by selling defective tires to the Government and by firing him for contacting the

Government regarding his concerns.

The Complaint expressly alleged that Goodyear violated the FCA by making "false statements regarding the testing, conformance to specifications, and reliability of tires manufactured at the Goodyear plant in Topeka, Kansas for TACOM, the Tank-Automotive Armaments Command of the United States Army." *ECF No. 1 ("Compl.")* at 2.  According to Relator, "Goodyear represented that its tires met all applicable requirements, Military Standards and Specifications in connection with their use on the Army's 2 and 1/2 Ton to 5 Ton trucks and in connection with their use on the High Mobility Multipurpose Wheeled Vehicle, commonly known as the Humvee." *Id*. However, "[t]he tires did not meet the testing, Military Standards and Specifications, and reliability standards and specifications due to faulty manufacture, inadequate or non-existent testing, and lack of appropriate quality control procedures, as well as the intentional disregard of defects and flaws in the manufacture of the tires, in spite of the fact that the defects were repeatedly pointed out to Goodyear's Managers by the Relator Orlando Guadalupe." *Id.*  "As a consequence, the Goodyear tires supplied to the Army unnecessarily endangered the health, safety and well being of Army personnel and anyone who might be exposed to, or come in contact with, the operation of the vehicles on which the tires were employed." *Id*.  Relator claims that, after he pointed out to Goodyear the fact that the curing of the tires was a flawed process leading to the production of defective tires, "his superiors did nothing." *Compl*. at 3.  Moreover, after efforts to apprise his superiors of this situation proved fruitless, Relator contacted the Army's Office of the Inspector General and various other officials about the problem – after which he was "summarily terminated by [Goodyear] in retaliation for his whistle blowing activities." *Id*. Based on these assertions, Relator alleged three *qui tam* claims against Goodyear for presenting false

-2-

claims for payment to the Government in violation of §§ 3729(a)(1), (a)(2) and (a)(7) of the FCA (Counts I, II and III, respectively), and a fourth claim against Goodyear for retaliatory discharge in violation of § 3730(h) of the FCA. *See id*. ¶¶ 87-100.

After conducting a year-long inquiry into these allegations, the Government filed a notice of its decision not to intervene and take over prosecution of this case, *ECF No. 12*, and the complaint was unsealed in September 2002, *ECF No. 13*. Following several extensions, Goodyear filed its answer on March 3, 2003. *ECF No. 18*. On March 28, 2003, the Court issued a Case Management Plan assigning the case to the standard case management track and giving the parties six months of discovery, with a discovery cutoff date of October 1, 2003. *ECF No. 30*. On May 14, 2003, Relator filed an Amended Complaint alleging the same claims and setting forth the same allegations quoted above. *See ECF No. 33*.

Goodyear pursued discovery by serving interrogatories and document requests on Relator, deposing Relator, deposing three officials of the Army's contracting and purchasing unit at TACOM, and providing the affidavits of various persons not deposed. Relator's discovery involved serving document requests on Goodyear more than four months into the six-month discovery period and cross-examining the TACOM officials whom Goodyear deposed. Although the Court opined, in a status conference on July 30, 2003, that Relator would need to present expert testimony and proof of field failures to support his claims, Relator chose not to designate an expert. Discovery closed on October 1, 2003.

On this same day, Relator filed a motion for extension of the discovery deadline, *ECF No. 41*, and a renewed motion on October 20, 2003. *ECF No. 45*. Shortly thereafter, the Court held a telephone status conference with counsel, at which time counsel for Relator requested that the lapsed discovery period be re-opened based on a government-commissioned study of tire performance in Iraq, the existence of which was first revealed to the parties during the TACOM depositions. The Court agreed to put the case on hold so that the parties could ascertain the findings of the field study, and subsequently denied as moot Relator's motions for extension. *See non-document order of 5/21/04*.

Over one year later, the Government filed a status report summarizing the results of the tire study conducted by Hodges Transportation, Inc., the independent contractor the Government hired to investigate tire failures in the field. *ECF Nos. 49, 51*. The Government reported that the tire study failed to uncover any evidence of manufacturing defects or anomalies. *See ECF No. 51* at 1. The Court then held another conference and established a schedule for briefing Goodyear's anticipated dispositive motion, which has now been fully briefed and is presently pending.

## II.    SUBSTANTIVE BACKGROUND

At all times relevant to this lawsuit, Goodyear has contracted with TACOM to supply tires to the United States Army for use on 2.5 ton trucks and Humvee vehicles. The contracts between Goodyear and TACOM are "commercial item acquisition" contracts under Part 12 of the Federal Acquisition Regulation ("FAR"). *See ECF No. 52, Ex. 25*. Under these contracts, TACOM agreed to purchase large quantities of certain part numbers, i.e., existing products sold commercially by Goodyear. *Id., Ex. 4 ("Epskamp Tr.")* at 19-20.

-4-

Relator was employed by Goodyear at its tire manufacturing plant in Topeka, Kansas from November 1994 until he was terminated in February 2002.  The plant manufactures a wide variety of tires for trucks and earthmovers primarily for commercial sale, although certain tires, including those at issue in this case, are sold to the federal government.

From 1994 to 1997, Relator worked on the manufacture of components for Humvee tires.  He never actually built or cured the Humvee tires themselves, nor did he know what procedures Goodyear's quality control employees performed on those tires after they had been built and cured. *ECF No. 55, Ex. E ("Guadalupe Tr.")* at 196-98.  Between 1998 and 2000, Humvee tires were cured in Mexico. *Am Compl.* ¶ 83. The process for curing Humvee tires returned to the Topeka plant some time in 2000. *Id*.

From approximately 1998 until his termination, Relator cured truck tires other than Humvee tires, including the 2.5 ton truck tire.  Curing is the stage in the manufacturing process when tires are molded into shape, receive a tread pattern and sidewall markings, and are vulcanized.  After the tires are cured, they proceed to the final finish and inspection area, and then to the warehouse.  As a tire layer/curer, Relator was the first line of defense to inspect a tire when it was taken from the press. In that role, Relator was to inform a quality assurance employee or a manager if he saw an irregularity; those other employees would, in turn, decide how to proceed. *Guadalupe Tr*. at 166-167.  At no point during his tenure at the plant did Relator ever work in Goodyear's quality assurance department. *Id*. at 182-183; 198.  Nor did he follow the tires after they left his department. *Id*. at 155-156.

Although Relator's 2001 complaint alleges that Goodyear manufactured and sold defective tires to the Government for use on its 2.5 ton trucks and Humvees, it is undisputed that he had

-5-

no contact with the process for manufacturing Humvee tires after 1997.  He does, however, have first-hand knowledge about curing 2.5 ton truck tires after 1997.  His primary complaint is that, at some point following the award of the August 2000 TACOM contract, Goodyear began to increase the temperature and decrease the time for curing 2.5 ton truck tire treads from 90 minutes to 86 or 82 minutes.  While this change increased productivity, it resulted in various tread defects.  Even if the defects could be repaired, Relator claims that they could not be sold to the Government because a supervisor, Kenny Jordan, allegedly stated, "We do not sell repaired tires to the military."  *Guadelupe Tr.* at 148-49, 171.  Thus, when Relator saw defective treads, he reported them to management which, he claims, ignored his complaints.

Some time prior to July 2000, Relator was diagnosed with multiple sclerosis.  His application for leave under the Family and Medical Leave Act ("FMLA") was approved by Goodyear on July 6, 2000.

In October 2000, Relator first contacted Army officials to report that Goodyear was manufacturing and selling defective tires to the Government.  He spoke to individuals at the Office of the Inspector General, and then to government special agents regarding his concerns.  (He also contacted three senators, the Federal Trade Commission, the National Highway Traffic Safety agency, the CIA, the Topeka Capitol Journal, Dan Rather and Bill O'Reilly.)

TACOM officials were contacted by a special agent who was investigating Relator's allegations.  *Epskamp Tr.*, at 25-29.  In order to respond to the agent's inquiry, a quality assurance representative at TACOM searched for records of any Quality Deficiency Reports ("QDRs") regarding the tires in question.  *See generally id.* at 35-36.  QDRs are submitted by field units whenever

-6-

equipment fails prematurely or in a manner that is suspicious.  The number and quality of QDRs are of

great importance to TACOM for obvious reasons.  As a result of its search, TACOM's  contracting

team leader, David Eskamp, concluded that there were either no QDRs on Goodyear Humvee or 2.5

ton truck tires, or none that were relevant.  He did testify, however, that due to an abnormally high

usage/failure rate of all tires in Iraq, TACOM had hired an independent contractor to investigate the

situation.  But it was investigating all tires, not just those manufactured by Goodyear.  Consequently,

TACOM officials advised the special agent that TACOM "didn't really need to be involved in the case

because we don't tell Goodyear how to build tires."  *Id*. at 36-37.

   After becoming aware of Relator's complaints, Goodyear invited TACOM to visit the

Topeka plant.  A group of TACOM representatives traveled to Topeka in early March 2001.  Their

site visit to the Topeka plant included a demonstration, a tour of the facility and a question and answer

session wherein plant manager Art Straehla addressed what Goodyear understood to be Relator's

allegation regarding in-factory repairs to new tires.  He displayed an example of a Goodyear tire that

had been buffed in order to remedy a problem caused by plugged vents in the tire molds.  According to

Relator, union representative Dennis Laughlin told him that Goodyear did not show TACOM

representatives a room containing defective tires.  *Guadalupe Tr.* at 247-48.

   Relator claims that after he reported his concerns about defective tires to the military, he

was harassed in the workplace by co-workers and management.  Particularly, he claims that his FMLA

status became a disciplinary issue after Goodyear learned of his whistleblowing activities, as did his

productivity.

On February 28, 2001, Relator met with area manager Chester DeMoss to discuss Relator's absenteeism.  DeMoss asked Relator to report to the business center office, but Relator insisted on seeing human resources manager Lee Schwartz first.  While he was waiting outside Schwartz's office, Relator, who observed DeMoss and other supervisors approaching, asked union representative Jeff Smith whether any bosses in the plant had ever been shot.  Relator then said, "Don't worry, I'm not in that state of mind yet." *ECF No. 52, Ex. 10, Arbitration Opinion and Award of July 21, 2001 ("First Arb. Op. and Order")*, at 2.

On March 8, 2001, Relator was discharged based on a violation of Goodyear's policy against workplace violence.  Relator filed a grievance against Goodyear which resulted in an arbitration hearing.  In its brief on Relator's behalf, the union characterized Relator as a whistleblower for having "questioned the Company as to what he perceived as a lack of inspection on tires being sent to our Armed Forces" and for "talking to the Federal Government," and concluded that being a whistleblower is "no grounds for dismissal." *ECF No. 52, Ex. 8, Union Brief* at 4-5, 7, 10-11, respectively.

At the arbitration hearing held on June 18, 2001, the union argued that Relator's termination was "in retaliation for [his] decision to call the Company's harassment hot line and for his call to the military criticizing the quality of the Company's tires." *First Arb. Op. and Order* at 5.  During the hearing, Relator testified that certain employees were "unhappy with him for reporting his concerns to the military because they think he has put their jobs at risk." *Id.* at 6.

Following the June 2001 hearing, Arbiter Terry Bethel issued a ruling finding that Relator, who denied having made the threatening statements, did in fact make those statements, but that

-8-

his comments did not justify termination.  *Id*. at 7-9.  However,

> given what [Relator] had said, the Company would have been justified
> in removing him from the plant and requiring him to undergo a
> psychological evaluation to insure that he posed no threat to the welfare
> of coworkers. . . . [Relator] should not have made his comments and
> his words warrant some disciplinary action.

*Id*. at 9.  Consequently, the Arbiter upheld his two-day suspension but reinstated his employment on

July 25, 2001.

On August 20, 2001, Relator filed the instant case alleging that Goodyear violated

various FCA provisions by selling defective tires to the military.  He also challenged his March 2001

termination despite having had his job reinstated less than one month earlier.  Relator, who subsequently

engaged Goodyear in discussions concerning his possible separation from the company, did not return

to work until October 2001.

Upon his return, Relator "found that Goodyear was still producing defective tires, and

he told the new plant manager, Larry Robbins, about the defective tires, and the fact that he had gone

to the Army's [Inspector General] about the defects." *Am. Compl*. ¶ 137.  He claims that the

harassment continued in the way of disciplinary action regarding his absences and productivity and that,

based on information and belief there were directives that instructed all management personnel to 'stay

away from Guadalupe.'" *Id.* ¶ 138.

On January 4, 2002, Relator was disciplined for refusing to attend a meeting concerning

his productivity.  A week later, on January 11, 2002, he was suspended a day without pay for failing to

follow a management directive, disciplined for poor productivity and counseled for absenteeism.  On

that same day, Goodyear conducted a search of Relator's locker in the presence of a union

representative, allegedly in response to allegations that Relator had temporarily removed controlled-access documents relating to the plant's quality control system.  No Goodyear documents were found.

On January 14, 2002, Relator returned to work.  Later that day, he went to the dispensary where the nurse gave him a pass to go to the hospital.  When Relator proceeded toward the gatehouse, night manager Phil Rogers approached him and told him to return to his position.  *Guadalupe Tr. 96-97.*  Relator repeatedly asked Rogers to sign his hospital pass, and Rogers refused.  Relator became increasingly upset and demanded, "Are you going to sign the fucking pass?"  *Id.* at 97.  Finally, he said, "The hell with you.  I'm going to the hospital."  *Id.*  Relator gave Rogers the proverbial "finger" during this exchange.  *Id.* at 237.  Goodyear subsequently placed Relator on a "two day cool with intent to discharge."

On January 18, 2002, shortly after midnight, Relator returned to the Topeka plant.  *Guadalupe Tr.* at 222.  The guard at the gate, who had previously been told not to permit Relator to enter the premises, told Relator he could not let him in.  Relator responded that he was "going in anyway" and proceeded forward.  *Id.* at 222.  Some managers approached Relator and told him to leave.  *Id.* at 225.  Relator, who had a tape recorder concealed in his jacket, surreptitiously recorded their exchange.  When one of the managers suggested that they have a discussion about his current status, Relator refused and told the manager he was not under Goodyear's direction as he was still on a hospital pass and he wanted to pick up his paycheck.  *Id.* at 230-31.  One of the managers told Relator that they were going to escort him to the gate.  *Guadalupe Tr.* at 231.  Relator asked the managers whether they were going to call the sheriff and referred to them as "coward managers, puppets."  *Id.* at 231-33.  Relator then announced, "Gentlemen, you've got a choice.  Physically restrain me and walk

-10-

me out or call the sheriff.  This is where I make my stand." *Id.* at 234.  Eventually, one of the managers

allowed Relator to drop off his paperwork at the dispensary and gave him his paycheck. *Am. Compl.*

¶ 159.

Goodyear subsequently terminated Relator's employment, effective February 11, 2002,

in a letter which stated:

> The causes of the discharge are violation of our workplace violence
> policy and your pattern of general ongoing disrespect for management
> authority.  Our policy states specifically "violation of this policy will be
> subject to disciplinary action up to and including discharge."

*ECF No. 52, Letter of February 11, 2002* at 1.  Relator again filed a union grievance regarding his

termination.

In the meantime, Goodyear obtained a restraining order against Relator on January 18,

2002, enjoining him "from interfering with the privacy or bothering, harassing, threatening, either in

person or by telephone or physically harming any manager, agent or employee of [Goodyear] at their

place of employment, residence or wherever they may be found." *ECF No. 52, Ex. 11,* at 1.   An

amended restraining order was entered ten days later to allow Relator "to attend and participate in

specifically arranged meetings with and under union representatives for the purpose of allowing due

process under the union contract." *Id., Ex. 12,* at 1.

On June 3, 2002, Arbiter Terry Bethel, who had presided over Relator's first

arbitration one year earlier, also presided over the second arbitration. *See generally ECF No. 52, Ex.*

*17, Opinion and Award of July 25, 2002 ("Second Arb. Op. and Order")* at 2. The proceeding

lasted all day and included testimony from numerous witnesses as well as Relator. *Id.; Guadalupe Tr.*

-11-

at 127.   Relator, who believed that he was terminated in retaliation for his whistleblowing activities, did

not raise retaliation as an issue until after closing arguments – at which point the Arbiter told him, "You

had your chance.  You're done." *Id*. at 129.

On June 25, 2002, the Arbiter issued a ruling wherein he referred to the previous

termination in March 2001 and stated as follows:

> I am not satisfied that Grievant's calls to managers and corporate
> officials was just cause for discharge, especially in the absence of
> evidence of a specific rule or evidence that he had been warned not to
> do so.  However, Grievant's conduct on the night of January 14, 2002,
> after he learned of the locker search, was of an entirely different
> character.  He verbally and profanely confronted two supervisors in
> anger.  Both supervisors felt his conduct was threatening, as did some
> bargaining unit employees.  In addition, Grievant ignored a guard's
> admonition not to enter the plant on January 18, 2002 and subsequently
> ignored a supervisor's order to leave the facility.  These actions have to
> be considered in the context of Grievant's earlier case.  It is true that I
> did not find his comment about whether supervisors had been shot to
> warrant discharge, but I did find it to be improper and worthy of
> discipline.  The supervisors' reaction to Grievant's angry confrontation
> with them on January 14 and January 18 was obviously influenced by
> what they knew he had said before.
>
> I find no merit to the Union's claim that the Company was out to get
> Grievant or that it failed to reveal the basis of the discharge.  Grievant
> encountered numerous problems following his reinstatement.  If the
> Company had been determined to discharge him, it might have done so
> earlier.  But it continued to give him additional chances.  In addition, the
> Company told the Union about Grievant's confrontations on [January]
> 14 and [January] 18.  Subsequent conversations between Union and
> Management representatives indicate that the Union knew of the
> conduct complained of on those dates.  Finally, although there is no
> doubt that Grievant has a serious medical condition, I find no evidence
> that this condition affected his conduct in this case.
>
> The Union made the best arguments it could on Grievant's behalf, but
> his confrontations with management on [January] 14 and [January 18],
> 2002 were proper cause for discharge.  Thus, I will deny the grievance.

-12-

*Second Arb. Op. and Order,* at 2.

On May 15, 2003, Relator filed an amended complaint making the same allegations in the first complaint, but now challenging both of his discharges.  *See Am. Compl.* ¶¶ 146-170.

On November 18, 2004, the Government filed a report in this case which included the affidavit of U.S. Army Project Engineer Robert J. Lada, who reviewed the available records including information received by the United States from Hodges Transportation.  *ECF No. 51, Att. 1 ("Lada Aff.")* ¶ 2.  Lada averred that the tire study involved the visual inspection of over 47,000 truck, trailer, Humvee and construction equipment tires manufactured by several different tire manufacturers including Goodyear, as well as more in-depth investigation of over 1000 tires.  *Lada Aff.* ¶¶ 7, 9, 13.  The tires were investigated for treadwear rate, location and date of manufacture, exterior damage, manufacturing anomalies, use of run flat device, presence of repair, potential cause of removal, improper inflation pressure, etc.  *Id.* ¶ 5.  Mr. Lada concluded that there was no evidence of tire manufacturing defect or anomaly in any of the tires inspected, but that the tires failed due to exterior damage or resulting wear out from vehicle mileage, overload, under inflation, misalignment or a combination of these conditions. *Id.* ¶¶ 8, 9, 11, 12, 14.  Thus, the Government concluded that it "does not possess any evidence at this time that Goodyear's tires did not meet specifications or were defective."  *ECF No. 51* at 2.

To date, TACOM continues to buy large quantities of Goodyear tires for its military vehicles.

On November 30, 2004, Goodyear filed its summary judgment motion arguing that Relator's *qui tam* claims should be dismissed because Relator has failed to show that Goodyear sold

defective tires to the military, and that Relator's retaliatory discharge claim should be barred by *res judicata* and/or dismissed on the merits because Relator has failed to provide adequate evidence of Goodyear's retaliatory motive or that its articulated reasons for firing him are pretextual.

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  All facts and inferences drawn therefrom must be viewed in a light most favorable to the nonmoving party.  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Wathen v. Gen. Elec. Co*., 115 F.3d 400, 403 (6th Cir. 1997).  If, after reviewing the record as a whole, a rational factfinder could not find for the nonmoving party, summary judgment is appropriate since there is no genuine issue of material fact for determination at trial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden of proving that no genuine issue of fact exists and that the moving party is entitled to judgment as a matter of law.  *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir.2001) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989)).  To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the nonmoving party to produce any evidence which would create a genuine dispute for the jury.  *Cox v. Kentucky Dept. of Transp*., 53 F.3d 146, 149 (6th Cir.1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d at 1477).

If the moving party satisfies its burden, then the burden of going forward shifts to the

-14-

nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury. *Cox*, 53 F.3d at 148. A scintilla of evidence in support of the nonmoving party's position is not enough. *Employers Ins. of Wausau v. Petroleum Specialties*, Inc., 69 F.3d 98, 102 (6th Cir.1995) (citing *Anderson*, 477 U.S. at 252). There must be evidence from which a reasonable jury could find for the nonmoving party. *Id.* If the evidence is insufficient to reasonably support a verdict in favor of the nonmoving party, the motion for summary judgment must be granted. *Cox*, 53 F.3d at 150.

## III.

### A.   *Qui Tam* **Claims (Counts I to III)**

The Sixth Circuit has explained that the purpose of the False Claims Act is "to provide for restitution to the government of money taken from it by fraud." *United States ex rel. Augustine v. Century Health Serv., Inc.*, 289 F.3d 409, 413 (6th Cir. 2002) (quoting *United States v. Hess*, 317 U.S. 537 (1943). Liability under the FCA occurs, *inter alia*, where a person or entity:

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; . . . or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government. . .

31 U.S.C. § 3729(a). To establish a genuine issue of fact, an FCA relator may not simply forgo the opportunity to take discovery in hopes that his own observations will suffice to support the claim. *See United States ex rel. Showell v. Philadelphia AFL ("Showell")*, Civ. A. No. 98-1916, 2000 U.S. Dist. LEXIS 4960, at *9, *15 (E.D. Pa. Apr. 18, 2000) (granting summary judgment for defendant

where the plaintiff had "undertaken minimal discovery . . . in his attempt to develop" his FCA claim, and

instead relied upon "unsubstantiated allegations and subjective opinions.").

The basis for Relator's *qui tam* claims is his position, based only on his own deposition

testimony, that Goodyear sold defective tires to the Government.  To establish that Goodyear sold

defective tires, Relator alleges that Goodyear failed to comply with the "detailed" military standards and

specifications set forth in its contracts with TACOM, and that Goodyear failed to comply with its own

specifications for manufacturing tires.  However, there is no evidence that Goodyear violated any

military standards or specifications, that Goodyear violated its own specifications, or that in fact

Goodyear sold any defective tires to the Government.

To begin, the Amended Complaint repeatedly asserts that Goodyear violated various

military standards and specifications which were set forth in its contracts with TACOM, resulting in the

sale of defective tires to the Government.  For instance, the Amended Complaint asserts:

> The tires did not meet the testing, Military Standards and
> Specifications, and reliability standards and specifications due to faulty
> manufacture, inadequate or non-existent testing, and lack of
> appropriate quality control procedures, as well as the intentional
> disregard of defects and flaws in the manufacture of the tires, in spite of
> the fact that the defects were repeatedly pointed out to Goodyear's
> Managers by the Relator Orlando Guadelupe.

*Am. Compl*. at 1-2.

> The United States Department of Defense has promulgated Military
> Standards that govern the manufacture of tires for use in military
> vehicles, and it sets out detailed requirements which must be satisfied
> by the manufactured tires, and certified as meeting those standards.

*Id*. ¶ 10

> Defendant Goodyear contracted with the Government agency
> TACOM to provide tires for the United States Army which complied

-16-

> with the Military Standards and would be tested to Army and TACOM
> Military Standards and Specifications. . .

*Id.* ¶ 11

> Goodyear represented and certified to its customer, and prime
> Government contractor – TACOM and the U.S. Army, that its tires
> complied with Military Standards and Specifications set forth in its
> contract with TACOM and the U.S. Army, when in fact its tires did
> not.  The tires described below were manufactured and sold to the
> U.S. Army without meeting the contractual requirements setting forth
> the Military Standards and Specifications for the tires.

*Id.* ¶ 12.  These allegations are utterly devoid of merit and, given their seriousness, should have been

dismissed by counsel at the conclusion of discovery.

It is beyond dispute that the contracts under which the Government purchased tires

from Goodyear for its 2.5 ton trucks and Humvees were "commercial item acquisition" contracts for

existing Goodyear products.  The contracts only required Goodyear to comply with its own commercial

specifications on tires sold to the military.  *Id*.  This means that the Government imposed no additional

design, performance or testing requirements upon Goodyear additional to Goodyear's own

specifications.  Relator admits as much in his brief.  *ECF No. 54 ("Opp. Brief")* at 3 ("The fact that

Goodyear writes its own specifications is not disputed."), 10 ("Goodyear writes its own specifications

for its tires.")

A review of Relator's deposition shows that he had absolutely no idea what

requirements, if any, the Government imposed on the manufacture of Goodyear's tires.  *See, e.g.,*

*Guadalupe Tr.*, at 158-59 (unable to identify any contract provision prohibiting the change of cure

times), 163-64 (unable to identify any contract provision specifying testing and inspection requirements

for the tires).  At most, the only thing Relator could say was that Goodyear violated a military

-17-

procedure. That is, based on his <u>personal experience in the military</u>, everything has a standard operating procedure ("SOP"),

> whether it's SOP on how to cook turkey or SOP on how to repair a – a Humvee truck or SOP on – on how to remove or ex – or replace a – a two-and-a-half-ton truck tire.  Everyone have an SOP.  That's what – I'm going by what the military has pretty much taught all of us for in service.  We had – Everything has a SOP.

*Guadelupe Tr*., at 165-66.  Yet he could not even identify a particular SOP that Goodyear violated. *See, e.g., id*. at 166.

Relator also alleges, "If anything is wrong with the tire, or if anything even <u>seems</u> to be wrong with the tire, even the slightest blemish, the Military Standards and the Specifications call for the tire to be rejected." *Am. Compl*. ¶ 37 (emphasis added).  In other words, if, during the manufacturing process, a tire develops a defect that can be repaired, it must nonetheless be rejected if it is being sold to the Government.  As shown above, however, there were no military specifications for Goodyear tires other than those Goodyear imposed on itself.

Relator's claim that repaired tires can't be sold to the military stems from a comment allegedly made by a supervisor.  At some point after entering the TACOM contracts in August 2000, Goodyear decided to increase the temperature and decrease the time for curing treads.  While this process change increased productivity, it resulted in various tread defects.  According to Relator, even if these defects could be repaired, repaired tires could not be sold to the military because a supervisor, Kenny Jordan, allegedly said, "We do not sell repaired tires to the military."  *Guadelupe Tr*., at 148-49, 171.  That's it.  Relator did not depose Mr. Jordan or provide his affidavit to support this allegation.  Nor did he depose or provide the affidavit of any co-workers who may have heard Mr.

-18-

Jordan make this alleged statement. Indeed, Relator was unable to identify any specification that prohibits Goodyear from selling repaired tires to the U.S. Army, *Guadelupe Tr.* at 149, 271, and at deposition Relator admitted that tires with cosmetic defects could be repaired and sold to the U.S.Army, *id.* at 181-182.

More importantly, TACOM officials confirmed that Goodyear has authority to change the curing temperature. *ECF No. 52, Ex. 3 ("Coleman Tr.")* at 66; *ECF No. 52, Ex. 2 ("Raleigh Tr.")* at 36-38. Changes in curing temperature necessarily impact the curing time. *Id.* Relator also alleges that Goodyear violated contract specifications by performing repairs in which rubber is added to a cured tire and the repaired tire is cured. *Am. Compl.* ¶¶ 42-45, 49, 51. However, the TACOM contract does not forbid such a practice, and the practice is expressly permitted under Goodyear's specifications. *See ECF No. 52, Ex. 22, Goodyear Global Master Specification 17M.01,* at G01548-G01551; *ECF No. 52, Ex. 23, Goodyear-Topeka, Tolerances and Limitations, EMBC Final Finish Cured Tire,* at G01784-G01787; *ECF No. 21, Ex. 21 ("Straehla Decl.")* ¶¶ 6-9.

The Amended Complaint alleges that Relator "saw scrap tires leave the plant – military tires that he manufactured for U.S. Army vehicles – being shipped out to TACOM and the U.S. Army that were defective and failed to meet Government contract specifications." *Am. Compl.* ¶ 15. Yet, he admitted at deposition that once the tires left his department, he did not follow them to the quality assurance department or to the warehouse. *Guadelupe Tr.* at 183. Therefore, he could not have known the status of tires sold to the Government.

Under the contracts, Goodyear warranted that the goods it sold to TACOM were "merchantable and fit for use for the particular purpose described in this contract." *ECF No. 52, Ex.*

*24, Contract for Commercial Items DAAE07-00-D-T086, eff. Aug. 16, 2000,* at G01543.  Under

the Federal Acquisition Regulations ("FAR"), this warranty requires only that the goods be "of at least

average, fair or medium-grade quality and must be comparable in quality to those that will pass without

objection in the trade or market for items of the same description."  48 C.F.R. § 12.404(a)(1) (2004).

There is no evidence that Goodyear failed to comply with this warranty other than Relator's

unsubstantiated allegations.

Relator was unable to identify any inspections or testing procedures that Goodyear

failed to follow in violation of its contract with TACOM.  *Guadalupe Tr.* at 163-168, 198.  In fact,

since Relator never worked in the quality assurance department, *id*. at 182, he had no familiarity with

the quality control procedures for tires, much less an ability to draw conclusions about what procedures

were or were not followed.  *See id*. at 197-198.  Relator admitted that he was only the first line of

defense when it came to inspecting the tires, that quality control was the second line of defense and

management the third line of defense.  He also admitted that he did not follow the tires to quality control

or to the warehouse.  Thus, despite his incendiary allegations, Relator has failed to identify a single

military or Goodyear specification that Goodyear violated when it manufactured the tires it sold to the

Government.

Finally, there is no evidence that Goodyear has sold defective tires to the U.S. Army.

When a tire being used by Army personnel in the field fails more than once for any reason, the user

submits a QDR.  TACOM officials confirmed at their depositions that QDRs did not indicate the

existence of any defects in the tires at issue in this case.[1]  *Epskamp Tr*. at 36; *Raleigh Tr*. at 23-24;

_____

[1]After the TACOM depositions, counsel for TACOM sent copies of QDRs to the parties.
The bulk of these QDRs concern recapped tires, which are not at issue in this lawsuit.  *See*
attachments to letter from Theresa M. Novell to Stephen P. Anthony and Oliver B. Dickens of
Oct. 8, 2003, Ex. 27; *Anthony Decl*. ¶ 7, Ex. 26.

*Coleman Tr*. at 43-44, 91-92.  Indeed, there is no evidence that Goodyear has received any complaints from TACOM about the quality of its 2.5 ton truck or Humvee tires.  *McDermott Decl.* ¶ 5; *Pate Decl.* ¶ 7.  The uncontested testimony of TACOM officials establishes that TACOM has no reason to believe that Goodyear has been selling defective tires to TACOM, *Epskamp Tr*. at 37, 41; *Raleigh Tr*. at 24-25; *Coleman Tr*. at 42, 46, or that the tires Goodyear sold to the Government failed to meet Goodyear specifications,  *Raleigh Tr.* at 7-8,

18-19.

TACOM's assessments are consistent with the findings of Hodges Transportation, Inc., the independent contractor hired by the Government to study tire usage in the field.  Based on this study and other evidence reviewed by the Government, the Government has concluded that there is no evidence at this time that the tire failures in Iraq are due to manufacturing defects or anomalies.  Rather, it appears that the high tire usage rate is due to exterior damage or resulting wear out from vehicle mileage, overload, under inflation, misalignment or a combination of these conditions.   Given that Relator is suing on behalf of the United States, the conclusions of the Government may be deemed party admissions. Fed. R. Evid. 801(d)(2).

When Relator was asked at deposition what proof he had that the 2.5 ton truck tires sold to the Government were defective, he admitted that he did not receive any information other than seeing that tires with defects were passed to the next department from his department.  He admitted that did not receive any information regarding 2.5 ton truck tires failing in the field, *id*. at 184; and he had no physical data on defective 2.5 ton truck tires, *id*. at 184-85.  When asked what proof he had that the Humvee tires were defective, he testified as follows:

> A.    The only information I have concerning Hummer tires like that
> were from one of the associates who – who was in the United States

Army.  He was in supply.  And he used to tell me that he used to see all these tires coming in – military tires coming in, and they all would – they would always run out because they was always having to change the tires out.  And I'm like, you know, "You're on a military reservation and you can't keep up with tires?"  He says, "A lot of these tires, they – they run them hard.  So either they don't maintain the – the structural damage that – that they're supposed to maintain or these tires are just walking out the window."

Q.     Who was it that told you that?

A.     The person that told me that, he used to work with me in curing F-Line tires.  His name, I think it was Mike – Mike Steward.  I think that – I think that's his last name, Steward.  But he – he was a supply sergeant.  And he was the one who informed me that he always had these problems that they couldn't keep up with the tires because they would always have – have to change out the tires out there.

Q.     Was he talking about a particular size of tire?

A.     Not really.  Pretty much in – in general, he would use the tires.

*Guadalupe Tr*. at 185-86.  This uncorroborated hearsay evidence is insufficient to carry Relator's burden of showing that Goodyear sold defective tires to the military.  It is also significant that Relator had no connection to the manufacture of Humvee tires since early 1997.

Relator also argues that Goodyear has not shown that its tires were fit for combat or that the tires it sold to the military lack defects.  *See Opp. Brief*, at 5-6.  This misconstrues the burden of proof, which plainly rests upon Relator.

In short, at the conclusion of discovery, Relator has failed to demonstrate anything other than the fact that some of the 2.5 ton truck tires he cured had defects, and that the defective tires were passed on to the next department despite his warnings to supervisors and management.  He concedes that he has no documentary evidence regarding defective tires in the field.  *Id*. 184-185.  The only evidentiary basis for Relator's *qui tam* claims is his own deposition testimony which is inconsistent and

-22-

in fact undercuts his claims.  He has failed to provide any corroborating evidence in the form of affidavits, deposition testimony (other than his own), or documents showing that the tires Goodyear sold to the Government were defective.  Instead, he has set forth a list of "witnesses he will call upon" who "will underscore and substantiate what was occurring on the production line."  *Opp. Brief* at 3.  A list of possible witnesses who will corroborate his allegations at a possible trial is insufficient to carry his burden of showing, in response to a summary judgment motion, that Goodyear sold defective tires to the military and, thus, presented false claims for payment to the Government.

Accordingly, the Court concludes that the *qui tam* claims (Counts I to III) must be dismissed with prejudice.

### B.    Retaliation claim

To establish a claim for retaliatory discharge under the FCA, a relator must show that (1) he engaged in a protected activity; (2) his employer knew that he engaged in the protected activity, and (3) his employer discharged or otherwise discriminated against the employee as a result of the protected activity.  *Yuhasz*, 341 F.3d at 566 (citing *McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 513-14 (6th Cir. 2000)).  As in federal discrimination cases, the Relator has the initial burden of establishing a *prima facie* case of retaliation by a preponderance of the evidence.  *See McNett v. Hardin Community Fed. Credit Union*, No. 03-4464, 2004 WL 3021805, at **3 n. 3 (6th Cir. Dec. 30, 2004).  If he so succeeds, the burden shifts to the defendant to articulate a nondiscriminatory reason for the action taken.  *Id*. at **4 (citation omitted).  Once the employer has offered a legitimate reason for the adverse employment action, the burden shifts back to the Relator to show that the employer's articulated reason is merely pretextual.  *Id*.

A Relator may not forgo the opportunity to take discovery hoping that his own

observations will suffice to support his claim.  *See Showell*, 2000 U.S. Dist. LEXIS 4960, at \*9, \*15.

Moreover, he cannot establish pretext and prove retaliation simply by disagreeing with Goodyear's

decision to terminate his employment.  *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1543

(11th Cir. 1997) (in race discrimination case, plaintiff could not establish that employer's proffered

reason was pretextual "merely by questioning the wisdom of the employer's reason, at least not where,

as here, the reason is one that might motivate a reasonable employer"), *cert. denied*, 522 U.S. 1045

(1998).  Rather, Rule 56(c) mandates the entry of summary judgment "against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.  He cannot

avoid summary judgment by resting on the allegations in his pleadings.  *Id*.  The Rule requires him "to

go beyond the pleadings" and, by affidavits, depositions, answers to interrogatories, and admissions on

file, "designate 'specific facts showing that there is a genuine issue for trial."  *Id*. at 324 (quoting Fed. R.

Civ. P. 56(e)).

          The undisputed facts show that, after a full hearing in June 2002 which included

Relator's own testimony, the Arbiter ruled that there was proper cause for Relator's discharge (i.e., his

confrontations with management in January 2002), and that there was no merit to the claim that

Goodyear was "out to get" him.  Under the doctrine of *res judicata*, Relator is precluded from litigating

his claim that there was another reason for his termination (i.e., retaliation for his whistleblowing

activities) here.  *See Fisher v. Martin Marietta Energy Sys., Inc.*, No. 86-5040, 1987 U.S. App.

LEXIS 2711 (6th Cir. Mar. 3, 1987) ("[T]he reason for plaintiff's termination has already been

decided.  In the context in which that issue was arbitrated, pretext was a relevant consideration, and

-24-

plaintiff could have raised retaliation as the real cause of her discharge.");[2] *cf. Ivery v. United States*, 686 F.2d 410, 414 (6th Cir. 1982) (affirming that an arbiter's finding of a wrongful discharge barred a later claim for wrongful discharge under the Federal Tort Claims Act); *Ford Hull-Mar Nursing Home v. Marr, Knapp, Crawfis & Assoc.*, 740 N.E.2d 729, 734 (Ohio Ct. App. 2000) (arbitration award entitled to preclusive effect); *Abrams v. Toledo Auto. Dealers Ass'n*, 762 N.E.2d 411, 414-15 (Ohio Ct. App. 2001) (plaintiff was precluded from relitigating the issue of the truthfulness of a particular statement because it had already been decided agaist him in a previous arbitration regarding whether there was just cause for his termination).

Relator complains that he was not afforded an opportunity to address his retaliation claim in his June 2002 arbitration. However, he did not raise the retaliation issue until after closing arguments, and it appears the Arbiter in fact took the issue into consideration when stating that there was no merit to the Union's claim that Goodyear was out to get Relator.

Even if *res judicata* didn't apply, the Court would still dismiss this claim because Relator has failed to show that Goodyear fired him in retaliation for his protected activity or that Goodyear's reason for firing him, backed by an arbiter, was pretextual. Again, Relator chose not to depose anyone at Goodyear and provides only his own testimony in support of these issues. which is insufficient to establish a factual issue entitling him to a trial. *See Carter*, 2004 U.S. App. LEXIS 22502, at *1.

---

[2] In *Fisher*, an arbiter had found that the plaintiff was terminated for excessive absenteeism, and that the termination did not violate the collective bargaining agreement. In a subsequent civil action, the court ruled that this arbitration award precluded the plaintiff from litigating that her termination was the result of retaliation against her for having sought workers' compensation benefits.

The Amended Complaint alleges that Relator "had a very good work history at Goodyear" before he "reported fraud on the U.S. Army in the manufacture of tires," but later was "'written up' on several occasions after Goodyear became aware that he had brought his complaints." *Am Compl*. ¶¶ 110, 118-19.  However, when reading Relator's deposition one thing becomes abundantly clear.  By the time he was terminated in October 2001, he had developed an extensive disciplinary record over numerous years, including repeated violations of the company policy against workplace violence.  *See, e.g., Guadalupe Tr.* 51, 53, 63-64, 70-71, 74, 79.  Indeed, after trying to downplay his disciplinary infractions, he freely admitted that he had been "written up for anything you can think of" in the years prior to his approaching TACOM about defective tires.  *Guadalupe Tr.*, at 64-65.

As an employer, Goodyear has a legitimate interest in ensuring a safe workplace and promoting a productive work environment free of insubordination and conflict.  The Sixth Circuit Court of Appeals has made clear, in the employment discrimination context, that "it is not appropriate for [the court] to second guess the business judgment of employers in personnel matters."  *Rush v. United Tech*, 930 F.2d 453, 458 (6th Cir. 1991) (affirming summary judgment for the employer in a wrongful discharge and age discrimination case); *see also Hedrick v. W. Reserve Care Sys. & Forum Health*, 355 F.3d 444, 462 (6th Cir. 2004) (internal citations and quotations omitted).  Thus, based on Relator's own testimony, Goodyear's decision to terminate him has a rational basis and Relator has failed to show that it was merely pretextual.

## V.   CONCLUSION

Based on the foregoing, Defendant The Goodyear Tire & Rubber Company's Motion

for Summary Judgment (**ECF No. 52**) is hereby **GRANTED**, and the case in its entirety is

**DISMISSED WITH PREJUDICE**.

        **IT IS SO ORDERED.**

                                    */s/Dan Aaron Polster 6/3/05*
                                    **Dan Aaron Polster**
                                    **United States District Judge**